Opinion issued July 25, 2013



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-10-00519-CV

————————————

**OKON EYO ONYUNG, M.D., THE LAW OFFICES OF YUEN & ASSOCIATES, P.C., THE LAW OFFICES OF YUEN & ASSOCIATES, PLLC, AND XENOS YUEN, Appellants**

**V.**

**COMFORT NKASI ONYUNG, CHRISTINE ENEBONG ONYUNG, NNAEMEKA ODUNZE, INDIVIDUALLY AND AS TRUSTEE OF THE ONYUNG LIVING TRUST, ODUNZE & LAZ, L.L.P., AND VICTOR IHEZUKWU, Appellees**

---

**On Appeal from the 434th District Court
Fort Bend County, Texas
Trial Court Case No. 04-CV-140141**

---

**MEMORANDUM OPINION ON REHEARING**[*]

Appellants Okon Eyong Onyung, M.D., The Law Offices of Yuen & Associates, P.C., The Law Offices of Yuen & Associates, PLLC, and Xenos Yuen appeal from a final judgment entered on two cases that were consolidated for a trial by jury. In one of the cases, Dr. Onyung sued appellees Comfort Nkasi Onyung (Dr. Onyung's wife, hereinafter referenced as Mrs. Onyung), Christine Enebong Onyung (the Onyungs' adult daughter), Nnaemeka Odunze (individually and as trustee of the Onyung Living Trust), Odunze & Laz, and Victor Ihezukwu, alleging various causes of action arising out of conveyances of real property. The trial court entered a take-nothing judgment on Dr. Onyung's claims. In the other case, Mrs. Onyung sued attorney Xenos Yuen and two law firms, The Law Offices of Yuen & Associates, P.C. and The Law Offices of Yuen & Associates, PLLC (the "Yuen law firms"), alleging various causes of action arising from their legal

---

[*] This opinion was originally issued on January 31, 2013. This court was subsequently notified that appellant Xenos Yuen had filed a Chapter 13 bankruptcy petition on January 21, 2013. We withdrew our opinion and abated the appeal. *See* 11 U.S.C. § 362(a); *Howell v. Thompson*, 839 S.W.2d 92 (Tex. 1992) (order); TEX. R. APP. P. 8.2. The Bankruptcy Court then modified the bankruptcy stay to permit the prosecution of this appeal, and we reissued our prior opinion without change on June 6, 2013. The appellants moved for rehearing arguing that there was an error in the court's opinion reversing mental anguish damages and raising an issue not previously presented to the court of appeals. We deny appellants' motion for rehearing. However, to clarify the limited scope of our remand to the trial court, we withdraw our prior opinion and judgment of June 6, 2013, and we issue this opinion and judgment in their stead.

2

representation of her and Dr. Onyung. The trial court entered a money judgment against Yuen and the Yuen law firms on Mrs. Onyung's claims.

We affirm in part and reverse and remand in part.

## Background

Dr. and Mrs. Onyung, both Nigerian citizens, were married in 1981 and had three children together. Dr. Onyung is a medical doctor who has participated in several businesses in Nigeria including practicing medicine, hospital administration, travel, shrimp trolling, and oil shipping. Mrs. Onyung assumed various roles in Dr. Onyung's businesses during their marriage. The couple had a house in Sugar Land titled in both of their names that their family used during school breaks. In 2000, the Onyungs purchased as investments four undeveloped lots in a subdivision called Bridlewood Estates in Fort Bend County. The Bridlewood lots were also titled in both of their names.

Dr. and Mrs. Onyung wanted to obtain residency in the United States for themselves and their children by taking advantage of the "EB-5" immigration visa program. According to testimony elicited at trial, a foreigner could obtain a permanent residency "green card" by investing $500,000 in a business creating at least ten jobs in a rural area. Mrs. Onyung was referred to Xenos Yuen, a Texas attorney specializing in immigration services, and in January 2001 she met with him in Texas to discuss the possibility of hiring him. She told Yuen that she and

3

her family wanted to move to the United States in the next few years and that they wanted to establish a real estate business to facilitate that move. Although Dr. and Mrs. Onyung returned to Nigeria before they could both meet personally with Yuen, they agreed together to hire him as their lawyer. Dr. Onyung, while in Nigeria, wrote a letter to Yuen to confirm their interest in hiring him. The letter stated, "My wife, Mrs. Onyung today informed me that she spoke to you about the above subject [of obtaining permanent residency for the Onyung family]. I am writing to confirm that we would like your law firm to handle our United States residency application. . . . We would therefore be grateful if your law firm could assist us in setting up this real-estate company and helping us in the United States Permanent Residency application process."

When Yuen had a client who was interested in the EB-5 program, his practice was to put the interested client in contact with the president of a real estate firm called CMC Development, Inc. Two days after Dr. Onyung wrote to Yuen, the president of CMC Development sent a letter addressed to Dr. Onyung, but not Mrs. Onyung, thanking him for "expressing your interest to join our EB5 (investment immigration) program." The letter outlined the requirements of the EB-5 program and proposed a limited partnership whereby Dr. Onyung, having a 99% interest in the limited partnership, would invest $500,000 as a limited partner, and CMC Development, having a 1% interest in the limited partnership, would act

4

as the general partner to conduct the business. The letter contained a signature line with the preprinted names of both Dr. and Mrs. Onyung, where they could indicate their acceptance of the proposal. Both Dr. and Mrs. Onyung signed the letter.

Around the time that CMC Development sent its letter to Dr. Onyung, Yuen prepared and faxed two documents which were each titled "Attorney Consultation and Fee Contract." One reflected that the purpose of the representation was to "apply US PERMANENT STATUS FOR Dr. Onyung, and his immediate family by investment immigration visa (EB5) category." The other reflected that the purpose of the representation was to "draft, review all contracts, trust and escrow agreement, business plan, formation of limited partnership and article of limited partnership, to review and file lien and security documents provided by the CMC Development as collateral to secure the funds invested as related to the investment immigration (EB5) application." The documents reflect that a $2,500 retainer was required for the immigration matter and a $5,000 retainer was required for the investment matter. The documents recited that the "undersigned, hereinafter referred to as 'Client'" and Yuen's law firm, Yuen & Associates, PLLC, had agreed to the terms of the document. At the end of each document was a signature block designated for "Attorney," "Client: O.E. Onyung," and "Client: Nksai Onyung." Dr. and Mrs. Onyung signed the documents on the lines designated for their respective names and faxed them back to Yuen, who then signed his name on

5

the lines designated for "Attorney." Dr. Onyung subsequently authorized a wire transfer of $7,500 from the couple's joint account to Yuen's law firm.

At trial, Mrs. Onyung testified as to her understanding that the documents were a contract between her, her husband, and Yuen's law office, and that Yuen would perform the immigration work for her, Dr. Onyung, and their children. Mrs. Onyung further testified that she believed that Yuen was her attorney. Yuen, however, testified that before they signed the documents, he told Dr. and Mrs. Onyung that he had only one client, Dr. Onyung. According to Yuen, he put Mrs. Onyung's name on the documents only because Dr. Onyung insisted so strenuously. When asked whether Mrs. Onyung was ever his client, he replied, "I don't know how to answer that question," but he maintained that he never provided legal services to her. He described the case as a "once in a lifetime situation."

Sometime after the "Attorney Consultation and Fee Contract" documents were signed, Dr. and Mrs. Onyung decided to form a company called Onyung Development, Ltd. to act as their investment vehicle relating to the EB-5 process. Dr. Onyung believed that there might be a conflict of interest in using CMC Development as the general partner of the prospective limited partnership because CMC Development was already engaged in obtaining immigrant visas for other people. Yuen proposed that another entity, CMC Builders Ltd., substitute as the

general partner. Yuen's wife was then an officer of CMC Builders, but this fact was never disclosed to Mrs. Onyung.

In June 2001, Dr. and Mrs. Onyung went to Yuen's office to review a "Rider Agreement of Articles of Limited Partnership [of] ONYUNG DEVELOPMENT LTD." The rider agreement was made between Dr. and Mrs. Onyung as limited partners of Onyung Development, Ltd. and CMC Builders as general partner, and it provided that Dr. and Mrs. Onyung owned 99% of the limited partnership while CMC Builders owned the remaining 1%. The limited partners agreed to place an "initial capital contribution" of $500,000 in an escrow account with their trustee, "Mr. Xenos Yuen." They also agreed to instruct Yuen to make the funds available to CMC Builders once it pledged adequate security in the form of real estate. CMC Builders agreed to produce a business plan that met the requirements of the EB-5 visa program. At such time as Dr. Onyung, Mrs. Onyung, and their family obtained permanent immigration status, Dr. and Mrs. Onyung would have had the right to demand that CMC Builders purchase their holdings, assets, and balance of the escrow account for $500,000. Mrs. Onyung understood that this agreement meant that the investment money would be returned to her and her husband after she and her family obtained permanent residency in the United States, and that they could foreclose on CMC Builders's pledged collateral if the repayment was

7

not received. An officer of CMC Builders and Dr. and Mrs. Onyung signed the agreement above their preprinted names.

Dr. Onyung and Yuen, but not Mrs. Onyung, signed a separate "Declaration of Trust and Escrow Account" that was dated the same day that the limited partnership agreement was signed. The document reflects that Dr. Onyung as trustor had transferred $500,000 to "The Law Offices of Yuen & Associates" as trustee for the benefit of Onyung Development, Ltd. The document recited that "Trustor has stated to trustee, and trustee has no information to the contrary, that all of the property transferred was the separate property of trustor on the date of the transfer." The document authorized the trustee to receive as compensation a fee of 1% of deposited funds. At trial Mrs. Onyung testified that she was unaware of the existence of this document. Approximately two weeks after the document was signed, Dr. Onyung authorized a U.S. bank to transfer $500,000 to Yuen from an account jointly owned by him and Mrs. Onyung. According to Mrs. Onyung, the bank would not have transferred such a large sum without her recorded oral authorization.

Several weeks later, Yuen sent a proposed business plan to the Onyungs. "Onyung Development, Ltd." appeared in the letterhead along with the address for Yuen's law firm. The business plan stated that "Onyung Development, Ltd. is being formed by Dr. Onyung and his wife Mrs. Onyung" and that they would

8

together have 99% ownership of the company. The business plan outlined the expected activities of the limited partnership in light of the requirements of the EB-5 visa application process. Dr. and Mrs. Onyung discussed the business plan and thought it was acceptable. Dr. Onyung handwrote a letter to Yuen acknowledging and approving the plan, saying that he and his wife approved the business plan and wanted him "to go ahead with the appraisal" of CMC Builders's proposed collateral properties.

In December 2001, Yuen sent appraisals of two properties to the Onyungs' residence in Nigeria. In a cover letter addressed to Dr. and Mrs. Onyung, Yuen asked, "Please advise you want to approve these collateral or not." The properties were then owned by one of Yuen's clients. Mrs. Onyung testified at trial that Yuen did not disclose to her who owned those properties. Dr. Onyung signed the letter beneath the preprinted words "Approved for Collateral" and above his preprinted name. There was no designated space in the letter for Mrs. Onyung's signature, and she did not sign it.

On several occasions in 2002, Mrs. Onyung went to Yuen's law office to inquire about the immigration matters, how the entity formation was progressing, and whether collateral had been obtained for the $500,000 investment. Mrs. Onyung was concerned about the lack of documentation for Onyung Development, Ltd. and what was being done with the $500,000. During these

9

discussions, Yuen told Mrs. Onyung that he was "working on it." He never told Mrs. Onyung that she was not his client.

The business plan for Onyung Development, Ltd. was never carried out as written, and the partnership was never registered with the Texas Secretary of State. Instead, in 2002, Dr. Onyung became president and a 65% percent owner of CMC Builders. He eventually acquired 100% of the company. Dr. Onyung loaned to CMC Builders at no interest the $500,000 that had been transferred to Yuen. Shortly before trial and after he had obtained his permanent residency, Dr. Onyung exercised his authority as 100% shareholder to transfer to himself the investment property that CMC Builders had acquired, which he eventually resold for $520,000.

Mrs. Onyung testified at trial that before the litigation she was unaware of her husband's ownership and role in CMC Builders, nor did she know about the loan. She also testified that she would never have agreed to an arrangement in which she was excluded. During the course of the litigation, Mrs. Onyung demanded that CMC Builders return the $500,000 to her. The company's attorney wrote back that because the limited partnership was never formed, the company was not obligated to return the money.

On August 25, 2003, the Economic Financial Crimes Commission of Nigeria detained Dr. Onyung for interrogation relating to suspected illegal use of

10

his oil shipping company. Mrs. Onyung testified that one of the couple's employees called to inform her that the EFCC had detained Dr. Onyung. Mrs. Onyung immediately engaged a Nigerian lawyer, James Ezeike, to secure Dr. Onyung's release from detention. Ezeike later told Mrs. Onyung that he met with her husband in prison, and he told him to instruct Mrs. Onyung to "secure" all of their American properties.

After receiving this message, Mrs. Onyung retained another Texas attorney, Victor Ihezukwu, to prepare documents to form the "Onyung Living Trust," transfer the Onyungs' Sugar Land house to the newly formed trust, and transfer the undeveloped Bridlewood lots to the Onyungs' eldest daughter, Christine. An attorney friend of Mrs. Onyung served without compensation as a trustee of the Onyung Living Trust. The Onyungs' son was the beneficiary of the trust. Mrs. Onyung signed her own name and her husband's name on the deeds transferring the titles to those properties.

According to Mrs. Onyung's trial testimony, she believed that she was protecting the assets from seizure by the EFCC, that she had authority to sign her husband's name on the deeds as a limited partner of Onyung Development, Ltd., and that she additionally had her husband's consent to do so. Although she understood that the name of the grantee on the deed was the legal owner of the property, she also testified that in accordance with her cultural beliefs, she

11

considered the property to be owned by the entire family. She testified that it was not her intention to deprive her husband of ownership of those properties. Christine similarly testified that her parents often put property in the children's names and that by accepting the Bridlewood lots she had no intention to deprive her father of his ownership interest.

In addition to executing the property transfers, Mrs. Onyung attempted to regain control of the $500,000 that had been entrusted to Yuen. On September 3, Mrs. Onyung went to Yuen's law office to retrieve her documents. Yuen refused to hand over the documents, told Mrs. Onyung to leave, and threatened to call the police if she did not. That same day, Mrs. Onyung sent two letters by fax to Yuen's law office. One letter, titled "Notice of Withdrawal," stated that Dr. and Mrs. Onyung no longer wished to be represented by Yuen's law office and that they were revoking the two "Attorney Consultation and Fee Contracts" that they had previously signed. Mrs. Onyung signed her name and her husband's name at the bottom of the letter. The other letter, titled "Revocation of the Declaration of Trust & Escrow Account," stated that Dr. Onyung was revoking the trustee's powers under the corresponding document that he had previously signed. Mrs. Onyung signed her husband's name to that letter as well. Her attorney, who was associated with the trustee of the Onyung Living Trust, sent Yuen another letter by fax. That letter stated that the attorney's firm was retained by Dr. and Mrs.

Onyung to represent them in their business and legal transactions, and it demanded that Yuen transfer his records to the firm.

The following day, Yuen sent a letter by fax to Mrs. Onyung's attorney stating that "we do not recognize Dr. Onyung's signature in Notice of Withdrawal and Revocation of the Declaration of Trust & Escrow Account to be his genuine signature." The letter further stated "As such, without a[n] original power of attorney from Dr. Onyung, we [are] afraid we cannot honor your request until we have a chance to clarify with [our] client, Dr. Onyung. This is especially true when Dr. Onyung and his wife have been having marital problems."

In a letter to Yuen dated September 30, 2003, Dr. Onyung stated that the instruments sent by Mrs. Onyung and purportedly bearing his signature were not signed by him. Dr. Onyung instructed Yuen to disregard the "phony letter" from Mrs. Onyung's lawyer and to "pursue with utmost vigor the Petition filed with [the] Bureau of Citizenship & Immigration Services so as to receive a positive response."

From late August until October 2003, Mrs. Onyung believed that her husband was in detention in Nigeria. In fact, the EFCC detained Dr. Onyung for a period of 18 days until September 12. In October, for the first time, Mrs. Onyung heard that her husband was actually in the Houston area. She did not believe it at first because she anticipated that Dr. Onyung would come to their family's house

13

in Sugar Land if he were in the area. She hired a private investigator whose investigation led to recording a video of Dr. Onyung and a Nigerian woman staying at a hotel.

In November, Dr. Onyung called Mrs. Onyung from Nigeria to ask her to visit him there. Mrs. Onyung arrived in Nigeria where the couple discussed what she had done to secure their American assets. According to Mrs. Onyung, Dr. Onyung was pleased with what she had done. However, Dr. Onyung "wasn't happy" that Mrs. Onyung refused to hand over the evidence that her private investigator had collected. He demanded that she sign a document known as a "head deed." A head deed, according to the testimony of Dr. Onyung's Nigerian lawyer, is a contractual instrument that requires the parties to "perfect" the transfer of properties. The head deed effectively divided the Onyung family's properties—including real properties located in Texas and Nigeria and various financial assets—between Dr. Onyung, Mrs. Onyung, and their children. The head deed reflected that the Sugar Land house would belong to Mrs. Onyung while the Bridlewood lots and the $500,000 investment related to the EB-5 application would belong to Dr. Onyung. According to Mrs. Onyung, when she refused to sign the document, Dr. Onyung threatened to implicate her in the EFCC investigation. Mrs. Onyung, fearing for her life, departed the country.

14

Shortly after Mrs. Onyung's return to Texas, she learned that her husband had filed several lawsuits in Nigeria against her and her children. As a result of that litigation, several financial assets were frozen including a Barclays trust account located on the Isle of Man. Previously, Barclays had transferred $240,000 from that account to a U.S. account twice a year. The money was used in part to pay for the Onyung children's tuition at private schools which would become due shortly after the transfers. The Onyungs' eldest daughter, Christine, testified that she spoke with her father by telephone in December 2003. She said her father was aware of what her mother had done with the family's properties and he was not upset about it. He instructed Christine to sell the Bridlewood lots for cash to pay for their family expenses. The Onyungs' middle daughter, Amore, testified that she had participated in that phone call and confirmed that her father told them to sell the Bridlewood lots to take care of themselves. Christine sold the Bridlewood lots to third parties for $240,000. Mrs. Onyung and Christine testified at trial that the proceeds were used for tuition and other family expenses, except that a portion of the proceeds were temporarily deposited in Mrs. Onyung's account so that she could sponsor Amore's student visa.

Unable to remain in the United States on a tourist visa, Mrs. Onyung returned to Nigeria in January 2004. She testified that her husband and his lawyer demanded that she sign the head deed, and when she refused they beat her so badly

that she required hospitalization. After that, Mrs. Onyung returned to the United States.

Mrs. Onyung and her children went to Nigeria in the summer of 2004 to see if Dr. Onyung would "have a change of heart." While in the country, she was arrested for illegal oil brokering and put in prison. Mrs. Onyung testified that Dr. Onyung's lawyer visited her in prison multiple times and told her that she would stay there until she signed the head deed. Although Mrs. Onyung at first refused, she eventually agreed to sign it, and she was released after having spent two months in prison.

Dr. Onyung testified to a different version of events than the one that Mrs. Onyung and the couple's children presented at trial. Dr. Onyung admitted that his attorney, James Ezeike, had visited him in detention in Nigeria, but he denied that he instructed Ezeike to tell Mrs. Onyung to secure their American properties. Dr. Onyung claimed that he was unaware of the property transfers at the time they were made and that he had no idea why Mrs. Onyung made them. He testified that when he got out of detention, he tried to contact his wife, but she did not answer or return his calls. With regard to the head deed, he testified that he and Mrs. Onyung held a meeting with several family members and their pastor in Nigeria to determine how to save their marriage. The agreed solution was to divide the family assets. Dr. Onyung denied that any threats were made against

16

Mrs. Onyung to force her to sign the head deed. Dr. Onyung testified that he would not have signed the head deed if he had known about the transfers of the real properties in Texas to the Onyung Living Trust and to the couple's daughter, Christine.

Dr. Onyung filed suit in Fort Bend County against Mrs. Onyung, Christine, the trustees of the Onyung Living Trust, the individual attorney who had formed the trust and prepared the deeds conveying the Sugar Land house and the Bridlewood lots, the firm whose attorneys represented Mrs. Onyung, and individual attorneys of that firm who had represented or assisted Mrs. Onyung (the "*Dr. Onyung v. Mrs. Onyung* suit"). Dr. Onyung alleged that Mrs. Onyung and his daughter, with the assistance of Mrs. Onyung's attorneys, had fraudulently and without his knowledge conveyed their Sugar Land house to the Onyung Living Trust and their Bridlewood lots to Christine. He also accused Mrs. Onyung of concealing what she had done when she signed the head deed under which the couple agreed that Dr. Onyung would acquire the Bridlewood lots. Dr. Onyung asserted claims against all the defendants for theft under the Texas Theft Liability Act, filing a fraudulent claim against real property, civil conspiracy, aiding and abetting, and trespass to try title. Against Mrs. Onyung only, he also asserted claims for breach of fiduciary duty, fraud and intentional deceit, and anticipatory breach of the head deed contract. He requested that a constructive trust be placed

17

upon all the conveyed properties. Yuen and his law firm represented Dr. Onyung in that suit from the filing of the original petition through trial.

In a separate suit filed in Harris County district court, Mrs. Onyung sued Yuen, his two law firms, and CMC Builders (the "*Mrs. Onyung v. Yuen*" suit). She alleged that Yuen had breached his fiduciary duty as her attorney by, among other things, failing to advise her of conflicts of interest that arose during the representation, representing her husband in a suit against her, failing to account for the $500,000 entrusted to him, and refusing to return his work file to her. She also alleged breach of contract by failing to form Onyung Development, Ltd. and carry out the related business plan, and that he also breached his contract by failing to apply for an EB-5 visa. Against CMC Builders, she alleged a breach of its fiduciary duties as a general partner, breach of contract, and violation of the Texas Uniform Fraudulent Transfer Act.

By agreement of the parties, the Harris County district court ordered that Mrs. Onyung's suit against Yuen and his law firms be transferred and consolidated with the case filed in Fort Bend County district court. Both cases were tried in the same proceeding to the same jury. At the time of trial, a divorce proceeding between Dr. and Mrs. Onyung was pending in Nigeria.

The jury answered two sets of questions, each corresponding to one of the consolidated cases. In the *Dr. Onyung v. Mrs. Onyung* suit, the jury found that

18

Mrs. Onyung did not have express authority to "use her best endeavors to secure [the Onyungs'] assets," but that she did have implied and apparent authority to do so. On Dr. Onyung's claims for theft, filing a fraudulent deed, and trespass to try title, the jury answered the questions against Dr. Onyung and in favor of the defendants. The trial court entered a take-nothing judgment in favor of the defendants.

In the *Mrs. Onyung v. Yuen* suit, the jury found that Mrs. Onyung was Yuen's client, Yuen was a trustee of the $500,000 with respect to Mrs. Onyung, and Yuen and his law firms both failed to comply with their agreements with Mrs. Onyung and committed fraud against her. The jury also found that Yuen did not comply with his fiduciary duties owed to Mrs. Onyung as an attorney and as a trustee. For Yuen's breach of fiduciary duty as an attorney, the jury awarded Mrs. Onyung damages of $7,500 for the difference in value between the services that Yuen agreed to perform and what he actually performed, as well as mental anguish damages of $50,000. For Yuen's breach of fiduciary duty as a trustee, it awarded no damages for the value of unperformed services, but it awarded her mental anguish damages of $2,500. For the fraud committed by Yuen or his law firms, the jury awarded her $100,000 in damages. The jury also found that the agreed fee to provide legal service to Mrs. Onyung was $3,750, while Yuen's fee to serve as trustee was $5,000. The trial court entered a money judgment in Mrs.

Onyung's favor of $100,000 plus interest and court costs against Yuen and his law firms. The court also awarded an additional $68,750 (plus interest and court costs) against Yuen individually, representing Yuen's agreed fees and the amounts awarded as damages for his breaches of fiduciary duty.

**Analysis**

Dr. Onyung, Yuen, and the Yuen law firms have identified eleven issues on appeal. The first ten pertain to the part of the judgment entered against Yuen and the Yuen law firms (the "Yuen entities"). The eleventh pertains to the part of the judgment entered against Dr. Onyung.

## I.    Two final judgments

In the first issue, the Yuen entities argue that the trial court erred by rendering two final judgments. They rely on Texas Rule of Civil Procedure 301 which provides, in relevant part, "Only one final judgment shall be rendered in any cause except where it is otherwise specifically provided by law." TEX. R. CIV. P. 301. Based upon the file-stamped dates on the judgments, according to which the judgment in the *Mrs. Onyung v. Yuen* suit was filed one day before the judgment in the *Dr. Onyung v. Mrs. Onyung* suit, the Yuen entities argue that the "second judgment" was intended to replace the "first judgment," and thus the *Mrs. Ongyung v. Yuen* judgment entered against them is a nullity. Mrs. Onyung

20

argues that the Yuen entities waived any error by failing to object to the rendition of two judgments.

"Because the law does not require that a final judgment be in any particular form, whether a judicial decree is a final judgment must be determined from its language and the record in the case." *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). A judgment is final if it disposes of all pending parties and claims. *Id.* A judgment rendered following trial on the merits is presumed to be final. *Moritz v. Preiss*, 121 S.W.3d 715, 718–19 (Tex. 2003). In some circumstances, "a final judgment may consist of several orders that cumulatively dispose of all parties and issues." *Noorian v. McCandless*, 37 S.W.3d 170, 173 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

The heading of the *Mrs. Onyung v. Yuen* judgment reflects the style and cause number of that case, and that it was consolidated with the *Dr. Onyung v. Mrs. Onyung* case. It identifies each party to the *Mrs. Onyung v. Yuen* suit: "Plaintiff Nkasi Comfort Onyung," "Defendant Xenos Yuen," "Defendants The Law Offices of Yuen & Associates, P.C. and The Law Offices of Yuen & Associates, PLLC," and "Defendant CMC Builders Co., Ltd." The body of the judgment does not mention any party to the *Dr. Onyung v. Mrs. Onyung* suit that was not also a party to the *Mrs. Onyung v. Yuen* suit. At the end of the judgment, it states, "This judgment is final, disposes of all claims and all parties, and is

appealable." The document reflects that judgment was signed and filed on March 16, 2010.

The *Dr. Onyung v. Mrs. Onyung* judgment reflects the style and cause number of that case. It identifies each party to that suit: "Plaintiff Dr. Onyung," "Defendant Nkasi Mrs. Onyung," "Defendant Christine Enebong Onyung," "Defendant The Onyung Living Trust appear[ing] through trustee Nnaemeka Odunze," "Defendant Nnaekmeka Odunze," "Defendant Odunze & Laz, L.L.P.," and "Defendant Victor Ihezukwu." The body of the judgment does not mention any party to the *Mrs. Onyung v. Yuen* suit that was not also a party to the *Dr. Onyung v. Mrs. Onyung* suit. At the end of the judgment, it states, "This judgment is final, disposes of all claims and all parties, and is appealable." The document reflects that the judgment was signed on March 16, 2010, but not filed until March 17.

We conclude that the two judgments, signed the same day, together constitute one final judgment for the consolidated cases, despite the fact that one judgment was filed a day after the other. When considered individually, neither judgment expressly addresses all parties and all claims. Only when considered together do they expressly address all parties and all claims. There is nothing in the record to suggest which judgment was signed first or that on March 17 the trial court intended to supersede the judgment filed the previous day. *See Quanaim v.*

22

*Frasco Rest. & Catering*, 17 S.W.3d 30, 37 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("It has long been the rule in Texas that a court must be 'express and specific' in vacating, setting aside, modifying, or amending a judgment."). There is no language in either judgment suggesting that one was intended to vacate, modify, correct, or reform the other, *see* TEX. R. CIV. P. 329b(d), (e), nor is there any particular finding or order in one judgment that conflicts with a finding or order in the other judgment such that an intent to vacate, modify, correct, or reform may be inferred.

The two judgments, which correspond respectively to the parties and claims in the two cases that were consolidated for trial, together dispose of all pending parties and claims in the two consolidated cases. Nothing in the record would preclude us from reading the two documents together to constitute a single final judgment. Accordingly, we overrule the first issue.

## II.    Enforceability of final judgment

In the second issue, the Yuen entities argue that the *Mrs. Onyung v. Yuen* judgment is so ambiguous that it is unenforceable. They focus on the part of that judgment ordering that "Plaintiff recover damages from Defendants Xenos Yuen, The Law Offices of Yuen & Associates, P.C., and The Law Offices of Yuen & Associates, PLLC" for $100,000, plus interest and court costs. The Yuen entities note that the jury found in two separate questions that Yuen individually had

23

committed fraud and that his law firms had committed fraud, but when asked what amount would compensate Mrs. Onyung for such fraud, they answered "$100,000" on a single line without apportioning the amount among the defendants. Thus they contend that there is no way to know for what amount each Yuen entity is liable, or whether the judgment intended to make them jointly and severally liable for the $100,000 award.

Mrs. Onyung interprets the judgment as making the Yuen entities jointly and severally liable for the $100,000 award. She argues that because the jury found that Yuen and the Yuen law firms had engaged in the same fraud, by law they must be jointly and severally liable for the corresponding damages. She suggests that this court could modify the judgment to clarify that Yuen and the Yuen law firms are jointly and severally liable.

The same rules of interpretation apply in ascertaining the meaning of judgments as in ascertaining the meaning of other written instruments. *Lone Star Cement Corp. v. Fair*, 467 S.W.2d 402, 405 (Tex. 1971); *Garcia v. Kubosh*, 377 S.W.3d 89, 98 (Tex. App.—Houston [1st Dist.] 2012, no pet.). "A judgment should be construed as a whole toward the end of harmonizing and giving effect to all the court has written." *Point Lookout West, Inc. v. Whorton*, 742 S.W.2d 277, 278 (Tex. 1987) (per curiam). "The entire content of the written instrument and the record should be considered." *Id.* (citing *Lone Star*, 467 S.W.2d at 405).

24

"When an ambiguous order is susceptible to two reasonable constructions, an appellate court should adopt the construction that correctly applies the law." *MacGregor v. Rich*, 941 S.W.2d 74, 75 (Tex. 1997) (per curiam); *see also State Farm Lloyds, Inc. v. Williams*, 791 S.W.2d 542, 546 (Tex. App.—Dallas 1990, writ denied) ("If the language of the judgment is susceptible to more than one interpretation, the one which renders the judgment more reasonable, effective, and conclusive, and which harmonizes it with the facts and the law of the case, should be adopted.").

When injuries resulting from the conduct of multiple tortfeasors cannot be apportioned with reasonable certainty, the plaintiff's injuries are indivisible and the tortfeasors are jointly and severally liable for the whole. *See Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 654 (Tex. 1996) (citing *Landers v. E. Tex. Salt Water Disposal Co.*, 248 S.W.2d 731, 734 (Tex. 1952)). The Yuen entities impliedly argue, however, that the jury could have found each of them responsible for a proportional share of Mrs. Onyung's fraud-related damages. Chapter 33 of the Civil Practice and Remedies Code provides rules for determining a tortfeasor's proportionate responsibility and whether the tortfeasor may be held jointly and severally liable for harm attributable to other parties. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.001–.017 (West 2008 & Supp. 2011). But that chapter only applies to "any cause of action based on tort in which a defendant, settling person,

25

or responsible third party is found responsible for a percentage of the harm for which relief is sought . . . ." *Id.* § 33.002; *see also F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 687 (Tex. 2007) ("Chapter 33 of the Texas Civil Practice and Remedies Code governs the apportionment of responsibility in cases within its scope."). The percentage of responsibility is determined for purposes of Chapter 33 by the trier of fact. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a). In this case, the jury was not asked to find the percentage of fraud-related harm for which each Yuen entity was responsible. Thus, Chapter 33's provisions concerning proportionate responsibility do not apply. *Cf. Tex. Capital Sec., Inc. v. Sandefer*, 108 S.W.3d 923, 926 (Tex. App.—Texarkana 2003, pet. denied) (holding that Chapter 33 did not apply when defendants were found jointly and severally liable); *accord Barnett v. Home of Tex. & Warranty Underwriters Ins. Co.*, Nos. 14-09-01005-CV & 14-10-00197-CV, 2011 WL 665309, at *7 (Tex. App.—Houston [14th Dist.] Feb. 24, 2011, no pet.) (mem. op.). Thus, assuming that the Yuen entities might have been entitled to have their separate percentages of responsibility determined by the jury, they waived appellate review of such an error by failing to object to the jury charge on the basis that the necessary questions were not included. *See Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007).

26

In this case, there was no allegation or evidence presented at trial that Mrs. Onyung had contact with any attorney at the Yuen law firms other than Yuen himself. Therefore Yuen, acting for himself or for the law firms, made the misrepresentations that form the basis of Mrs. Onyung's fraud claims. A factfinder could have reasonably concluded that Mrs. Onyung's injuries are indivisible and cannot be apportioned with reasonable certainty between Yuen and his law firms. *See Amstadt*, 919 S.W.2d at 654.

To the extent there is any ambiguity as to joint and several liability, in light of the record, the language of the judgment, and the common law of tort liability, we adopt the most reasonable construction which is that Yuen and the Yuen law firms are jointly and severally liable for the damages occasioned by the fraud. *See MacGregor*, 941 S.W.2d at 75. Moreover, we hold that as a whole, the judgment as written is not so ambiguous that it cannot be carried into execution. *See Stewart v. USA Custom Paint & Body Shop, Inc.*, 870 S.W.2d 18, 20 (Tex. 1994). We overrule the second issue.

## III. Breach of fiduciary duty

In the fourth and ninth issues, Yuen argues that the evidence adduced at trial shows as a matter of law that he could not have breached any fiduciary duty to Mrs. Onyung in his capacity as her attorney. He contends that for there to be a breach of fiduciary duty as an attorney, there must have been a substantial

27

relationship between his representation of Mrs. Onyung in the immigration-related work and his representation of Dr. Onyung in the lawsuit against her. *See, e.g.*, *Metro. Life Ins. Co. v. Syntek Fin. Corp.*, 881 S.W.2d 319, 320–21 (Tex. 1994) (citing Tex. Disciplinary R. Prof. Conduct 1.09(a)(3) (1989), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G. app. (West 2005) (State Bar Rules art. X, § 9)). Yuen argues that there was no such substantial relationship between the investment immigration application and Dr. Onyung's suit relating to the fraudulent conveyances, and furthermore, that there was no evidence that he used or disclosed any confidences that he learned from Mrs. Onyung in the suit against her. He also argues that the trial court erred by failing to enter a directed verdict on Mrs. Onyung's claim for breach of fiduciary duty because there was no evidence that he breached any duty before Mrs. Onyung terminated the representation. Yuen does not challenge the jury's separate finding that he breached his fiduciary duty as a trustee.

Mrs. Onyung argues that the substantial relation test referenced by Yuen is a test that is primarily relevant to whether an attorney should be disqualified from representation rather than whether an attorney breached his fiduciary duty. She argues that the evidence proved that Yuen breached his fiduciary duty in several ways beyond representing Dr. Onyung in the lawsuit against her: Yuen agreed but failed to create a limited partnership in which Mrs. Onyung would have been a

28

limited partner; he agreed but failed to obtain real estate as collateral for the $500,000 immigration-related investment; he failed to disclose to her that one of his clients owned the properties that he recommended as collateral for the $500,000 investment; he failed to disclose to her that his wife was an officer of CMC Builders, the proposed general partner of the limited partnership; he failed to provide her an accounting of the $500,000 investment; and he agreed but failed to apply for permanent immigration status for Mrs. Onyung and her children.

These issues effectively present a challenge to the legal sufficiency of the evidence to support the jury's finding that Yuen breached his fiduciary duty as an attorney. In a legal sufficiency, or "no-evidence" review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we credit favorable evidence if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *Id.* We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* at 822. So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight accorded to their testimony. *Id.* at 819. Although we consider the evidence in the light most

favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

"A fiduciary relationship exists between attorneys and clients as a matter of law." *Kennedy v. Gulf Coast Cancer & Diagnostic Cntr. at Southeast, Inc.*, 326 S.W.3d 352, 359 (Tex. App.—Houston [1st Dist.] 2010, no pet.). "[A] lawyer must conduct his or her business with inveterate honesty and loyalty, always keeping his client's best interest in mind." *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 561 (Tex. 2006) (quoting *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 867 (Tex. 2000) (Gonzales, J., concurring and dissenting)). The attorney-client relationship is thus one of most abundant good faith, requiring absolute candor, openness, and honesty, and prohibiting any concealment or deception. *Kennedy*, 326 S.W.3d at 359. "Breach of fiduciary duty by an attorney most often involves the attorney's failure to disclose conflicts of interest, failure to deliver funds belonging to the client, placing personal interests over the client's interests, improper use of client confidences, taking advantage of the client's trust, engaging in self-dealing, and making misrepresentations." *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Generally, a lawyer's fiduciary duties to a client extend only to dealings within the scope of the underlying representation. *Joe v. Two Thirty Nine Joint*

30

*Venture*, 145 S.W.3d 150, 159 (Tex. 2004). "As a fiduciary, an attorney is obligated to render a full and fair disclosure of facts material to the client's representation." *Willis v. Maverick*, 760 S.W.2d 642, 646 (Tex. 1988). When interpreting and enforcing attorney-client agreements, "it is 'not enough to simply say that a contract is a contract'" because "'[t]here are ethical considerations overlaying the contractual relationship.'" *Hoover Slovacek*, 206 S.W.3d at 560 (quoting *Lopez*, 22 S.W.3d at 868 (Gonzales, J., concurring and dissenting)). Also, "the work product generated by the attorney in representing the client belongs to the client." *Kennedy*, 326 S.W.3d at 360.

The jury question regarding whether Yuen complied with his fiduciary duty as an attorney provided, in relevant part, as follows:

> To prove he complied with his [fiduciary] duty, Mr. Yuen must show:
>
> a. the transaction in question was fair and equitable to Ms. Onyung;
>
> b. Mr. Yuen made reasonable use of the confidence that Ms. Onyung placed in him;
>
> c. Mr. Yuen acted in the utmost good faith and exercised the most scrupulous honesty toward Ms. Onyung;
>
> d. Mr. Yuen placed the interests of Ms. Onyung before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Ms. Onyung, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary;

31

e.  Mr. Yuen fully and fairly disclosed all important information to Ms. Onyung concerning the transaction;

f.  Mr. Yuen represented Ms. Onyung with undivided loyalty; and

g.  Mr. Yuen timely informed Ms. Onyung of all conflicts of interest[.]

Yuen did not object to this description of fiduciary duty and, accordingly, it is by this standard that the sufficiency of the evidence is measured. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

Based on his arguments on appeal, Yuen apparently assumes that the jury found that he breached his fiduciary duty as an attorney to Mrs. Onyung solely by representing Dr. Onyung in the lawsuit against her. However, as Mrs. Onyung notes, the evidence would permit a jury to find that Yuen breached his fiduciary duty owed to her even before representing her husband in the lawsuit. Based upon the evidence adduced at trial, the jury could have believed that Yuen altered the legal structure of the immigration investment to exclude Mrs. Onyung's equal ownership interest and participation and that he did so without informing her. Also, according to Mrs. Onyung's testimony, Yuen did not disclose the fact that his wife was an officer of CMC Builders, the proposed general partner of the limited partnership in which Mrs. Onyung was supposed to become a limited partner, nor did he disclose that one of his clients owned properties that he proposed as collateral for the $500,000 investment. Moreover, it is undisputed that

when Mrs. Onyung demanded documents relating to Yuen's representation, he refused to comply. Measured against the jury charge's description of fiduciary duty, these facts would support a finding that Yuen breached his fiduciary duty as an attorney.

We overrule the fourth and ninth issues.

## IV.     Inconsistent jury findings

In the fifth and seventh issues, Yuen argues that jury rendered contradictory findings in response to questions on whether he breached his agreements and fiduciary duties owed to Mrs. Onyung. In response to questions 1 and 1-A, the jury found that although the Yuen law firms agreed with Mrs. Onyung to prepare the limited partnership documents and apply for permanent residency status, Yuen did not agree to render these services individually. Yuen contends that the jury thus contradicted itself in answering question 2 by finding that Yuen "fail[ed] to comply with [his] agreements with Ms. Onyung." He challenges the judgment that he is liable for the $100,000 in fraud damages based on the instruction accompanying question 20:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Mrs. Onyung for her damages, if any, that resulted from such fraud?
>
> > Consider the following elements of damages, if any, and none other.

33

The difference, if any, between the value of the services Mr. Yuen or Yuen & Associates, P.C., and Yuen & Associates, PLLC *agreed to perform under the agreement* and the value of the services performed by Mr. Yuen or Yuen & Associates, P.C., and Yuen & Associates, PLLC, if any. The difference in value, if any, shall be determined at the time and place the services were performed.

(Emphasis supplied.) Yuen argues that because the jury found in response to questions 1 and 1-A that Yuen individually had not entered into an agreement with Mrs. Onyung, the jury's finding that she suffered $100,000 in fraud damages cannot be applied to him.

Mrs. Onyung argues that Yuen's brief is inadequate in its failure to provide any supporting authorities. She also argues that Yuen failed to preserve any alleged error with respect to the language of the jury charge by failing to object in the trial court. On the merits, Mrs. Onyung argues that Yuen, in his capacity as an attorney, can owe fiduciary duties to her even though he was not a party to any agreement in his individual capacity, and that it would be incorrect to premise a finding of fraud or breach of fiduciary duty on a finding of breach of contract.

As indicated by Mrs. Onyung, Yuen's appellate brief does not provide citations to any authorities with respect to issues five and seven. Without citations to legal authorities, we are unable to ascertain with certainty the legal foundation for his complaints on appeal. *See* TEX. R. APP. P. 38.1(i). Nevertheless, in the

34

interest of justice, we construe Yuen's brief as arguing that the jury rendered inconsistent findings.

Rule 295 of the Texas Rules of Civil Procedure provides a mechanism for remedying inconsistent jury findings in the trial court:

> If the purported verdict is defective, the court may direct it to be reformed. If it is incomplete, or not responsive to the questions contained in the court's charge, or the answers to the questions are in conflict, the court shall in writing instruct the jury in open court of the nature of the incompleteness, unresponsiveness, or conflict, provide the jury such additional instructions as may be proper, and retire the jury for further deliberations.

TEX. R. CIV. P. 295. The failure to utilize this mechanism may be fatal to an appeal of any alleged inconsistency, because "[t]o preserve error that the jury's findings are inconsistent, the complaining party must raise an objection in the trial court before the jury is discharged." *Izen v. Comm'n for Lawyer Discipline*, 322 S.W.3d 308, 324 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The record does not reflect that Yuen or any other party objected to any inconsistencies in the jury's verdict before the jury was discharged. Accordingly, we hold that Yuen waived appellate review of any alleged inconsistencies in the jury's verdict. *See id.*

We overrule the fifth and seventh issues.

## V. Exemplary damages, mental anguish, and fraud

In the sixth issue, Yuen and the Yuen law firms challenge the sufficiency of the evidence to support the trial court's judgment for exemplary damages, mental anguish, and fraud. The jury answered the questions about actual malice and exemplary damages in the negative, and the judgment did not award any amount of money for exemplary damages. We therefore overrule any issue pertaining to the award of exemplary damages.

### a. Mental anguish

The jury awarded mental anguish damages against Yuen only in his individual capacity. In particular, the jury found that Yuen breached his fiduciary duty as a lawyer and that Mrs. Onyung suffered $7,500 in actual damages and $50,000 in mental anguish damages as a result of that breach. The jury also found that Yuen breached his fiduciary duty as a trustee of the $500,000 investment, and that Mrs. Onyung suffered no actual damages but $2,500 in mental anguish damages as a result of that breach. The jury also found that Mrs. Onyung's agreed legal fees were $3,750 and her trustee fees were $5,000. Simple arithmetic shows that the trial court included all of these sums found by the jury in the judgment against Yuen.

Yuen contends that the awards of $50,000 for mental anguish arising from his breach of fiduciary duty as a lawyer and $2,500 for mental anguish arising from

36

his breach of fiduciary duty as a trustee fail as a matter of law because mental anguish damages are not recoverable based on an award of purely economic damages or in the absence of an award of actual damages. Yuen relies on *Douglas v. Delp*, 987 S.W.2d 879 (Tex. 1999), in which the Supreme Court of Texas held that "when a plaintiff's mental anguish is a consequence of economic losses caused by an attorney's negligence, the plaintiff may not recover damages for that mental anguish." 987 S.W.2d at 885.

Mrs. Onyung argues that *Douglas* is not controlling because her mental anguish was caused by fraud, which is more than mere negligence. But the jury was not asked to determine if she suffered mental anguish as a result of the fraud committed by Yuen and the Yuen law firms or what amount of money would compensate her for any such mental anguish. Rather, the jury was asked only to determine what amount of money would compensate her for mental anguish caused by Yuen's breach of his individual fiduciary duties as a lawyer and as a trustee.

Mrs. Onyung further argues that because Yuen did not object to the inclusion of mental anguish damages in the jury charge, he has not preserved the error on appeal. Addressing the merits, Mrs. Onyung maintains that the law permits her to recover mental anguish damages for the fraud that Yuen committed.

37

She does not, however, address Yuen's argument that there was no evidence that she suffered mental anguish as a result of his conduct.

"No evidence' points may be raised by either (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue or (5) a motion for new trial." *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991). Yuen raised the argument that there was legally insufficient evidence that he caused Mrs. Onyung mental anguish in both his motion for judgment notwithstanding the verdict and motion for new trial. Although he could have preserved the issue by objecting to the submission of the issue to the jury, his post-trial motions were sufficient to preserve the error for appellate review. *See id.*

"Courts should 'closely scrutinize' awards of mental anguish damages." *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 860 (Tex. 1999) (quoting *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex. 1997)). "[A]n award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). In the absence of such direct evidence, "we apply traditional 'no evidence' standards to determine whether the record reveals any evidence of 'a high degree of mental pain and

38

distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger' to support any award of damages." *Id.* (quoting *J.B. Custom Design & Bldg. v. Clawson*, 794 S.W.2d 38, 43 (Tex. App.—Houston [1st Dist.] 1990, no writ)). "As a general rule, evidence to establish 'adequate details to assess mental anguish claims' can be demonstrated by 'the claimants' own testimony, that of third parties, or that of experts.'" *N.N. v. Inst. for Rehab. & Research*, 234 S.W.3d 1, 9 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (quoting *Parkway*, 901 S.W.2d at 444).

Mrs. Onyung testified that when she went to Yuen's office to retrieve her documents, Yuen became angry and threatened to call the police if she did not leave. His letter addressed to Mrs. Onyung's attorneys asserts that she "verbally assaulted" his colleagues during that visit. Based on this evidence, Mrs. Onyung may well have been angry and upset as a result of Yuen's breach of fiduciary duty. However, we find no evidence in the record demonstrating that Mrs. Onyung experienced an emotional response meeting the legal standard for mental anguish, and Mrs. Onyung has identified none in her briefing. Accordingly, we hold that the evidence is legally insufficient to support a finding that Mrs. Onyung experienced a high degree of mental pain and distress that disrupted her daily routine as a result of Yuen's conduct. *See Parkway*, 901 S.W.2d at 444. Absent such proof, the jury's award for mental anguish damages cannot stand. *See Finger*

*v. Ray*, 326 S.W.3d 285, 294 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (holding that client failed to present sufficient proof of mental anguish when her testimony established only "that she felt worry, anxiety, and stress due to [her attorney's] conduct]").

We sustain Yuen's sixth issue insofar as he challenges the awards for mental anguish damages.

### b. Fraud

The Yuen entities also challenge the judgment awarding Mrs. Onyung $100,000 in fraud damages because there is no evidence that she was injured and injury is an element of her cause of action for fraud. They argue that she cannot show that she was injured by any fraudulent act because the $500,000 entrusted to the firm to be invested in furtherance of the EB-5 visa was returned to Dr. Onyung and thus to the marital estate. Put another way, they allege the complete absence of a vital fact, i.e., evidence of injury. *See City of Keller*, 168 S.W.3d at 811.

A person commits fraud by (1) making a representation of material fact (2) that is false (3) and was known to be false or asserted recklessly without knowledge of its truth (4) with the intent that the misrepresentation be acted upon, (5) and the person to whom the misrepresentation is made justifiably relies upon it (6) and is injured as a result. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009). "An injury is suffered when a legally protected

40

interest is wrongfully invaded." *Nabours v. Longview Savs. & Loan Ass'n*, 700 S.W.2d 901, 909 (Tex. 1985) (citing RESTATEMENT (SECOND) OF TORTS § 7 (1965)). The concept of injury is not restricted to monetary loss. *Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 212 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *see also Lee v. Killian*, 761 S.W.2d 139, 141 (Tex. App.—Fort Worth 1988, no writ) (holding that fraudulently induced legal waiver barring person from bringing lawsuit constituted an injury); RESTATEMENT (SECOND) OF TORTS § 7 cmt. a. (noting distinction between injury, which is the "invasion of a legally protected interest," and harm, which is "loss or detriment in fact").

The evidence at trial showed that Dr. Onyung transferred $500,000 from a joint account to Yuen, as trustee, to be invested for an EB-5 visa, which would enable his family members to apply for visas as derivative beneficiaries. Yuen invested the money with CMC Builders, which later returned the money by pledging assets, which Dr. Onyung liquidated. Because the evidence also showed that Dr. and Mrs. Onyung were married at the time of trial, the money was returned to the marital estate. To the extent that Mrs. Onyung sought return of the $500,000—or a share of it—her remedy lies in a divorce proceeding. *See Chu v. Hong*, 249 S.W.3d 441, 445 (Tex. 2008) (holding that either spouse can seek

41

recovery from a defrauding third party but a third party cannot be held liable in tort when community property is taken by one of the spouses).

However, it is not at all clear on appeal that Mrs. Onyung alleges that her injury from Yuen's fraudulent activities was the loss of the $500,000 investment. She does not make such an argument in her brief. Rather, she argues that her loss was "paying for an attorney to represent her and receiving no representation, no return on her investment, no green card, no lien on collateralized property, no ownership interest in an ongoing venture, and no security that her interests were being handled by an advocate with a duty to look out for those interests."

There was no evidence introduced at trial as to the projected but unrealized return on her investment, or the economic value of a green card, a lien on collateralized property, or an ownership interest in what she had hoped would become an ongoing venture. *See, e.g.*, *City of Keller*, 168 S.W.3d at 811 (discussing complete absence of evidence of a vital fact). And there is also nothing in the record to suggest that she had a legally protected interest in obtaining a green card or realizing a return on her investment. *See* RESTATEMENT (SECOND) OF TORTS § 7 cmt a.

As to Mrs. Onyung's contentions that she was injured by not receiving the legal representation and services that she believed Yuen agreed to provide, she relies on her testimony and that of Yuen. Her testimony establishes that she had an

42

attorney-client relationship with Yuen and that he failed to perform the services that he agreed to perform. She testified that she and her husband paid Yuen $7,500 for his promised legal services and that they had previously been informed that Yuen's fee for such services would be $15,000. Separate and apart from the award of fraud damages, Mrs. Onyung was compensated for the attorney's fees that she paid by way of the award of a disgorgement of Yuen's fees. She is not entitled to recover the same element of damages twice. And there is no other evidence to support the jury's award of $100,000 as fraud damages. As such, we conclude that the trial court's judgment awarding Mrs. Onyung $100,000 is not supported by legally sufficient evidence, and we sustain this part of issue six.

## VI.    Deposition testimony

In the tenth issue, the Yuen law firms argue that the trial court erred by denying their motion to strike the deposition testimony of a former officer of CMC Builders. Yuen, who served as counsel during this litigation representing the Yuen law firms, personally did not receive formal notice of that deposition, although the lawyer representing Yuen did receive notice. The Yuen law firms contend that the challenged testimony was highly prejudicial to their case and should not have been admitted.

Mrs. Onyung contends that the Yuen law firms received actual notice of the deposition but instead chose not to attend, and that they were afforded the

43

opportunity to redepose the witness but chose not to do so. Mrs. Onyung argues that the Rules of Civil Procedure were therefore satisfied with respect to the admissibility of the deposition testimony.

We review a trial court's decision to admit evidence over a party's objection for an abuse of discretion. *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 235 (Tex. 2011); *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). "[U]nder an abuse of discretion standard, the court of appeals cannot overrule the trial court's decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002). "Moreover, the court of appeals cannot substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion." *Id.*

The Rules of Civil Procedure provide that a "notice of intent to take an oral deposition must be served on the witness and all parties a reasonable time before the deposition is taken." TEX. R. CIV. P. 199.2(a). Rule 203.6(b), concerning when deposition testimony may be used in a proceeding, provides:

> All or part of a deposition may be used for any purpose in the same proceeding in which it was taken. . . . "Same proceeding" includes a proceeding in a different court but involving the same subject matter and the same parties or their representatives or successors in interest. A deposition is admissible against a party joined after the deposition was taken if . . . that party has had a reasonable opportunity to redepose the witness and has failed to do so.

44

TEX. R. CIV. P. 203.6(b).

Before the notice of deposition was served, Yuen's personal counsel sent a letter to Mrs. Onyung's counsel stating that she represented both Yuen and the Yuen law firms. Accordingly, Mrs. Onyung's counsel sent formal notices for the deposition of CMC Builders's former officer only to Yuen's personal counsel. It is undisputed that Mrs. Onyung's counsel did not serve notices to Yuen, who represented the Yuen law firms.

On the day of the deposition, neither Yuen nor his personal counsel attended. Two days later, Yuen's personal counsel wrote a letter to Mrs. Onyung's counsel to "clarify" that she only represented Yuen, and she acknowledged that she may have caused the confusion and apologized for not clearing it up earlier. She took responsibility for not informing Yuen about the notices that were sent to her office.

Several weeks later, Mrs. Onyung's counsel wrote to the parties, including Yuen at his law office, expressing his willingness to redepose CMC Builders's former officer and suggesting dates, but he also asserted his intention to use the existing deposition testimony at trial. Several weeks later, after the dates suggested by Mrs. Onyung's counsel had passed, Yuen asserted that Mrs. Onyung would have to pay the expenses for a new deposition of the witness. Opposing counsel responded to reiterate his intention of using the existing deposition

45

testimony and to express his refusal to pay for a court reporter in the event that a new deposition occurred.

Prior to the presentation of the deposition videotape to the jury, the trial court heard and denied the Yuen law firms' objection to the admission of the deposition testimony. The trial court observed that the parties did not avail themselves of the opportunity to request that the redeposition be compelled, and when Mrs. Onyung's lawyer provided the "opportunity to cure" the notice issue, "nobody got in line to get that done." The court stated that "[i]t's more important that everyone was given the opportunity to follow up on the deposition" and that its ruling "was based upon the fact that the overture was made to give anyone who hadn't taken part in the depositions the chance to do so, and no one did that."

Although the Yuen law firms, through Yuen, did not receive formal notices of the first deposition, they did receive a letter from Mrs. Onyung's counsel inviting them to redepose the witness and suggesting possible dates. The record does not reflect that the Yuen law firms responded to that invitation. Rule 203.6(b) provides that a "deposition is admissible against a party joined after the deposition was taken if . . . that party has had a reasonable opportunity to redepose the witness and has failed to do so." TEX. R. CIV. P. 203.6(b). The rule is premised on the principle that parties should have the opportunity to cross-examine deponents before such deposition testimony is admitted against them at trial. *See Stevenson v.*

*Koutzarov*, 795 S.W.2d 313, 317 (Tex. App.—Houston [1st Dist.] 1990, writ denied). But the rule also provides that if a party joined after a deposition was taken has a reasonable opportunity to redpose the witness and fails to do so, that party bears the burden of its inaction and cannot oppose admission of the deposition testimony on the ground that it was not present at the deposition. *See* TEX. R. CIV. P. 203.6(b).

Although Rule 203.6(b) does not directly apply to this situation because the Yuen law firms were not parties "joined after the deposition was taken," the principle undergirding the rule applies nevertheless. The trial court evidently concluded that the Yuen law firms had a reasonable opportunity to redepose CMC Builders's former officer but failed to do so, which is a conclusion supported by the record. The consequence of their inaction is that they could not oppose admission of that testimony on the ground that they were not present at the deposition. *See id.* If the Yuen law firms believed that they were not provided a reasonable opportunity to depose the witness, they could have moved to compel another deposition. *See* TEX. R. CIV. P. 215.1. Moreover, if they believed that Mrs. Onyung's counsel had abused the discovery process, they could have moved for sanctions. *See* TEX. R. CIV. P. 215.3. The Yuen law firms pursued neither of these potential remedies.

On this record, we hold that the trial court's ruling was not unreasonable or arbitrary, nor was it made without reference to guiding principles. *See Butnaru*, 84 S.W.3d at 211. We overrule the tenth issue.

## VII. Waived and moot issues

### A. Yuen entities

In the third issue, the Yuen entities argue that the trial "abused its discretion by holding up the entire jury, over the objection of the defendants, for a marathon deliberation" that resulted in a verdict rendered at 3:00 a.m. They argue that this predicament "likely caused [the jury's] desire to end the deliberation prematurely and involuntarily." The brief does not reflect any citations to the record or authorities on this issue. Accordingly, the brief does not comply with the Texas Rules of Appellate Procedure, and we overrule issue three. *See ERI Consulting Eng'rs v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010); TEX. R. APP. P. 38.1(i).

In their eighth issue, the Yuen entities argue that the trial court erred by awarding Mrs. Onyung attorney's fees. The judgment does not reflect that the trial court awarded attorney's fees to any party. Because the record plainly refutes the factual premise of the argument, we overrule the eighth issue.

The Yuen entities advance several arguments in their reply brief that were not presented in their first brief on appeal. To the extent that the Yuen entities attempted to raise issues for the first time in their reply brief, we do not consider

48

those issues. *McAlester Fuel Co. v. Smith Int'l, Inc.*, 257 S.W.3d 732, 737 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("An issue raised for the first time in a reply brief is ordinarily waived and need not be considered by this Court.").

## B. Dr. Onyung

In the eleventh issue, Dr. Onyung argues that the trial court erred by submitting jury questions concerning whether Mrs. Onyung had express, implied, or apparent authority to use her best efforts to secure the couple's assets. Dr. Onyung argues that his express written authority was legally required for Mrs. Onyung to transfer the Sugar Land and Bridlewood real properties and that inclusion of questions and corresponding definitions concerning implied authority and apparent authority "obviously confused the jury and led to a great miscarriage of justice."

To preserve for appeal an alleged error in the jury charge, Dr. Onyung was required to timely object so as to make the trial court aware of his complaint. *Equistar Chems.*, 240 S.W.3d at 868 (citing TEX. R. CIV. P. 272 & 274); *see also* TEX. R. APP. P. 33.1(a). Otherwise, any such error is waived. *See* TEX. R. CIV. P. 272, 274. Our examination of the record reveals that Dr. Onyung objected to the definition of "express authority" in the jury charge. The definition provided, in relevant part: "Express Authority means that Authority [is] given to the agent by explicit agreement, either orally or in writing." Dr. Onyung argued that the

inclusion of the words "orally or in writing" would be confusing to the jury because "it doesn't make a difference unless there is a writing authorizing [the express authority]." His counsel proposed removing the words "either orally or in writing" from the jury charge. The trial court declined to change the definition of express authority. The record does not reflect that Dr. Onyung specifically objected to the inclusion of questions and definitions in the jury charge concerning implied and apparent authority. Consequently, he has failed to preserve for appellate review any alleged error resulting from the inclusion of those charges. *See Equistar Chems.*, 240 S.W.3d at 868. We overrule the eleventh issue.

## Conclusion

Having concluded that the evidence was legally insufficient to support the trial court's judgment awarding Mrs. Onyung a total of $52,500 for mental anguish and $100,000 for fraud, we reverse the trial court's judgment insofar as it awards those mental anguish and fraud damages, and we render judgment that Mrs. Onyung take nothing on her mental anguish and fraud claims. We affirm the trial court's judgment as to all other causes of action, and we remand this case to the trial court for recalculation of pre- and post-judgment interest and entry of judgment in accordance with this Court's opinion, judgment, and mandate. *See Phillips v. Bramlett*, No. 12-0257, 2013 WL 2664056, at *3–4 (Tex. June 7, 2013).

Michael Massengale
Justice

Panel consists of Justices Bland, Massengale, and Brown.